FILED
UNITED STATES DISTRICT COURT
· DENVER, COLORADO

MAR 3 6 2010

GREGORY C. LANGHAM
CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civ. Act. No. 97-D-1611-WYD

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

THE CITY AND COUNTY OF DENVER, COLORADO,

      Defendant.

## CONSENT DECREE

This Consent Decree is entered into by Plaintiff United States of America ("United States") and Defendant the City and County of Denver ("Denver") in order to settle the United States' claims against Denver, and Denver's counterclaims against the United States, asserted in *United States of America v. The City and County of Denver*, Civ. Act. No. 97-D-1611 (D. Colo.) ("Lawsuit").

### I. RECITALS

A. On September 8, 1983, the "Denver Radium Superfund Site" ("Site") was placed on the National Priorities List, which lists and ranks sites with releases of hazardous substances to establish priorities for remedial actions taken under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*

- 1 -

B. The Denver Radium Superfund Site includes several properties, which have been divided by the United States Environmental Protection Agency ("EPA") into 11 "operable units." A description and the location of the operable units is depicted on Attachment A, attached hereto.

C. On or about July 1, 1996, the Denver City Council adopted Ordinance No. 549, Series of 1996. Ordinance No. 549 contained a number of provisions, including the following addition of Section 48-112 to the Denver Municipal Code:

> Section 48-112. Radioactive Waste Disposal Fee. Any person who disposes of, or implements a remedial action to control or to attempt to control radioactive wastes or radium contaminated material shall be charged a fee of $8.50 per cubic foot of radioactive waste or radium contaminated material that remains on property within the City and County of Denver with no intention of and provision for subsequent removal.

The Ordinance also includes provisions relating to street cuts in the "Radium Streets" (basically defined as those streets located within Operable Unit VII); documentation of the location of radioactive waste or radium-contaminated material disposed of in the City and County of Denver; the creation of a "Radioactive Waste Management Fund"; and the imposition of "administrative fees" relating to excavation and improvement permits in Radium Streets.

D. On or about March 3, 1997, the Denver City Council adopted Ordinance No. 145, Series of 1997, which amended Ordinance No. 549. Ordinance No. 145 changed the amount of the "disposal fee" from $8.50 per cubic foot of contaminated material to $5.10 per cubic foot of contaminated material remaining on private property, and, as to material "that remains beneath public rights-of-way or other property owned by the

- 2 -

City," added a $12,000 fixed fee for each separate geographic location where radioactive waste or radium contaminated material is disposed or controlled, along with a "variable fee" of $30.06 per cubic foot of radium contaminated material remaining under public rights-of-way or other Denver-owned property. Other provisions of Ordinance No. 549 remained in effect.

E. In December 1996, The S.W. Shattuck Chemical Company, Inc. ("Shattuck"), which was remediating Operable Unit VIII pursuant to a CERCLA unilateral order issued by EPA, filed a complaint against Denver, seeking a declaration that Ordinance No. 549 was void and unenforceable as to Shattuck, and requesting injunctive relief preventing Denver from enforcing the Ordinance as to Shattuck. *The S.W. Shattuck Chemical Company, Inc. v. The City and County of Denver*, Civ. Act. No. 96-D-2968 (D. Colo.) ("*Shattuck v. Denver*"). Shattuck later amended its complaint to also challenge Ordinance No. 145. Denver counterclaimed against Shattuck and its then-parent company, Salomon Smith Barney Holdings, Inc. ("Salomon"), asserting claims for trespass and nuisance (arising from the contamination of Denver's property from OU VIII contamination), and for Denver's past and future CERCLA response costs.

F. In April 1997, Denver assessed a $9.35 million fee against Shattuck and Salomon for Shattuck's disposal of contaminated soils at OU VIII from 1996 to 1997.

G. In July 1997, the United States filed the Lawsuit, asserting that the Ordinances are void and unenforceable under the United States Constitution as against the United States, Shattuck and persons performing a remedial action at the Site. For

- 3 -

relief, the United States sought a declaratory judgment that the "disposal fee" established by Ordinance No. 549, as amended, is void and unenforceable against the United States, Shattuck, or other persons performing a remedial action at the Site, and a permanent injunction prohibiting Denver from enforcing the disposal fees as against the United States, Shattuck, or any other person that has performed, is performing, or will perform a remedial action at an operable unit of the Denver Radium Superfund Site.

H. Denver answered, denying that the relief sought by the United States was appropriate, and asserting a number of affirmative defenses. Denver also asserted three claims for relief in its counterclaim against the United States: (a) a joint and several liability claim for Denver's past response costs under CERCLA; (b) a declaratory judgment claim for Denver's future response costs under CERCLA; and (c) a claim that the United States has effected a taking of Denver's property without affording Denver procedural due process, in violation of the Fifth Amendment.

I. *Shattuck v. Denver* and the Lawsuit were consolidated by the Court.

J. Shattuck and Denver entered into a settlement agreement dated March 3, 1999, regarding the claims made against each other in *Shattuck v. Denver*. In general, in consideration of the payment of certain funds to Denver, Denver released Shattuck and Salomon from any and all obligations pursuant to Ordinance Nos. 549 and 145 for radioactive waste or radium contaminated material located on Shattuck's property located at 1805 South Bannock Street in Denver through the effective date of their settlement, agreed not to seek any other payments from Shattuck or Salomon relating

- 4 -

to radioactive wastes located on the Site, and not to sue Shattuck or Salomon regarding the Site. Denver reserved the right to enforce ordinances and local laws of general applicability (such as real estate taxes), against Shattuck or Salomon.

K. In June 2000, EPA and the State of Colorado modified the OU VIII remedy from onsite stabilization and solidification of contaminated soils to removal and offsite disposal of contaminated soils.

L. The United States asserts that, pursuant to 42 U.S.C. § 9707(a), it could bring an action to recover past and future costs it has incurred or will incur with regard to the Site from Denver.

M. The United States and Denver ("Parties") agree that the Denver Radium Superfund Site presents an important public health and environmental concern, and that settlement of this litigation would be in the public interest.

N. The Parties further agree that it is in the interest of the public, the Parties and judicial economy to resolve the issues in the Lawsuit without protracted litigation.

O. Through this Consent Decree, the Parties have agreed to a settlement of the claims, counterclaims and defenses raised in the Lawsuit without any admission of any issue of fact or law, which settlement they consider to be a fair, just, equitable and adequate resolution of the Lawsuit.

P. The Parties agree that they have had disagreements about the application of supplemental standards and institutional controls and what parties should bear the costs associated with supplemental standards and institutional controls at the Denver

Radium Superfund Site and about the appropriate remedy at Operable Unit VIII, the Shattuck site. The Parties further agree that this Consent Decree is intended to fully resolve the issues between them relating to the Denver Radium Superfund Site.

Q. Denver takes the position that it is not liable for the management, removal or remediation of any radioactively contaminated groundwater at the Denver Radium Superfund Site.

R. The Parties, without the necessity of trial or adjudication of any issue of fact or law, and without any admission of liability by either of the Parties, consent to entry of this Consent Decree.

## II. JURISDICTION

1. <u>Jurisdiction</u>. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because the United States' claims for relief arise under the Constitution and laws of the United States; 42 U.S.C. § 9613(b), because it involves a controversy under CERCLA; and 28 U.S.C. § 1345, since the Lawsuit was commenced by the United States.

## III. DEFINITIONS

2. <u>Definitions</u>. Unless otherwise expressly provided herein, terms used in this Consent Decree and its attachments which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. In addition, the following definitions shall apply to this Consent Decree:

a. "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, *et seq.*

b. "Consent Decree" or "Decree" means this Consent Decree and all attachments thereto. In the event of any conflict between this Decree and any attachment, this Decree shall control.

c. "Day" means a calendar day. In computing any period of time under this Decree, where the last day would fall on a Saturday, Sunday or federal or Denver holiday, the period shall run until the close of business of the next business day.

d. "Denver" means the City and County of Denver, Colorado.

e. "Denver's Future Response Costs" means those costs incurred by Denver in relation to the Site after the date of entry of this Decree which would be compensable as "necessary costs of response . . . consistent with the national contingency plan" within the meaning of CERCLA section 107(a)(4), 42 U.S.C. § 9607(a)(4), including, but not limited to, direct and indirect costs incurred by Denver in reviewing or developing plans, reports and other items pursuant to this Consent Decree, or verifying the remediation work, as well as costs incurred by Denver in otherwise implementing or overseeing this Consent Decree. Denver's Future Response Costs shall include, but are not limited to, payroll costs, contractor costs, travel costs, laboratory costs, and the costs incurred to implement or enforce management plans or institutional controls.

f. "Denver's Past Response Costs" means all costs, including, but not limited to, direct and indirect costs, incurred by Denver in relation to any Operable Unit within the Site from September 8, 1983, through the date of entry of this Decree which would be compensable as "necessary costs of response . . . consistent with the national contingency plan" within the meaning of CERCLA section 107(a)(4), 42 U.S.C. § 9607(a)(4), including, but not limited to, direct and indirect costs incurred by Denver in reviewing or developing plans, reports and other items, or verifying the remediation work, as well as costs incurred by Denver in connection with Section 8 of this Consent Decree. Denver's Past Response Costs shall include, but are not limited to, payroll costs, contractor costs, travel costs, laboratory costs, and the costs incurred to implement or enforce management plans or institutional controls.

g. "EPA" means the United States Environmental Protection Agency and any successor departments or agencies of the United States.

h. "EPA's Offsite Rule" means the regulation set forth at 40 C.F.R. § 300.440.

i. "Interest" means interest on the terms and conditions and at the rate set forth in CERCLA section 107(a)(4), 42 U.S.C. § 9607(a)(4), as amended at the time the Interest accrues.

j. "Lawsuit" means the action that is captioned *United States of America v. The City and County of Denver*, Civ. Act. No. 97-D-1611 (D. Colo.).

k. "National Contingency Plan" or "NCP" means the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to CERCLA section 105, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

l. "Paragraph" means a portion of this Decree identified by an arabic numeral or upper case letter.

m. "Parties" means the United States and Denver.

n. "Section" means a portion of this Decree identified by a Roman numeral.

o. "Site" means the Denver Radium Superfund Site, located in Denver, Colorado.

p. "United States" means the United States of America and all of its agencies, departments and instrumentalities.

q. "Waste Materials" means radioactive or radium contaminated asphalt, roadbase and soil at or from the Site.

## IV. PARTIES BOUND

3. <u>Parties bound</u>. This Consent Decree applies to and is binding upon the United States and Denver.

## V. PAYMENT BY UNITED STATES

4. <u>Payment by the United States</u>. The United States shall pay to Denver the sum of Five Hundred Fifty Thousand Dollars ($550,000.00) as soon as reasonably

practicable after entry of this Decree by the Court. If payment is not made within 120 days after entry of this Decree by the Court, interest will accrue on the unpaid balance beginning from the 121st day after entry of the Decree by the Court until paid. This payment is made in settlement of Denver's claims against the United States for Denver's Past Response Costs and Denver's Future Response Costs. Payment to Denver shall be made by electronic wire transfer directed to the following account, unless the Parties agree to use another account at the time of the transfer

| | |
|---|---|
| Bank Name: | JP Morgan Chase Bank<br>1125 17th St., Denver, CO  80202 |
| ABA Number: | 021000021 |
| Account Number: | 193488945 |
| For Credit to: | The City and County of Denver Manager of Finance |
| Further credit to: | Department of Environmental Health |
| Text: | Settlement of Case No, 97-D-1611, U.S. v. City and County of Denver, U.S. District Court for the District of Colorado |

## VI. COVENANTS NOT TO SUE AND RESERVATION OF RIGHTS BY UNITED STATES

5. <u>United States' covenant not to sue.</u>

      a. In consideration of the actions that have been and will be performed by Denver under the terms of this Consent Decree and of Denver's dismissal of its counterclaims in the Lawsuit with prejudice, and except as provided in Paragraphs 5(c)

and 6 of this Consent Decree, the United States covenants not to sue or take administrative action against Denver pursuant to Sections 106, 107 and 113 of CERCLA, 42 U.S.C. §§ 9606, 9607 and 9613, with respect to (i) the Site; (ii) response actions taken or to be taken, and response costs associated with such response actions, related to the Site; and (iii) any facility or site at which Denver disposed or disposes of Waste Materials from the Site on or after April 19,1996, provided that the facility or site for such disposal satisfied the EPA's Offsite Disposal Rule at the time of such disposal. The shipments listed in Appendix A were made at facilities that met EPA's offsite disposal rule at the time of disposal and qualify under this provision. This covenant not to sue is conditioned upon Denver's satisfactory performance of its obligations under this Consent Decree. This covenant not to sue extends only to Denver and does not extend to any other person.

b. Within a reasonable time of Denver's written request, EPA will inform Denver, in writing, whether a specific disposal facility or site satisfies EPA's Offsite Rule as of the time of EPA's response to the request. With regard to whether a specific disposal facility or site satisfies EPA's Offsite Rule for purposes of the covenant granted in Paragraph 5(a)(iii), Denver may rely on EPA's response regarding whether a specific facility or site satisfies the Offsite Rule for a period of thirty days from the date of such response, unless Denver obtains actual knowledge that a specific disposal facility has been determined by EPA not to satisfy the Offsite Rule.

c. Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right of the United States to institute proceedings in a new action, or to issue an administrative order seeking to compel Denver (i) to perform response actions relating to one or more Operable Units of the Site, or (ii) to reimburse the United States for additional costs of response regarding such operable units if, subsequent to the entry of this Consent Decree:

(1) conditions previously unknown to EPA at one or more Operable Units of the Site, are discovered, or information previously unknown to EPA in whole or in part, is received; and

(2) EPA determines that these previously unknown conditions or information together with any other relevant information indicates that the remedial action EPA selected for such Operable Unit of the Site is not protective of human health or the environment.

d. For purposes of Paragraph 5(c), the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date of the lodging of this Consent Decree.

e. The United States acknowledges and agrees that by fulfilling its obligations under this Consent Decree, Denver is implementing a portion of the Operation and Maintenance obligations of the State of Colorado under Colorado's Superfund State Contract, consistent with 40 U.S.C. § 104(d)(1)(A) and 40 C.F.R. Part

35, Subpart O, with the United States regarding the Denver Radium Superfund Site. The parties do not intend that Denver will incur CERCLA liability at the Site solely by virtue of Denver's performing its obligations under this Consent Decree. Should the United States exercise its right to bring a new action pursuant to the preceding Paragraph 5(c), the United States will have the burden of proving the basis of Denver's liability, and there shall be no presumption that Denver is a liable party because of this Consent Decree or any work Denver performed pursuant to this Consent Decree, and Denver shall be entitled to raise any and all defenses it may have to claims in any such action by the United States.

6. <u>United States' general reservation of rights</u>. The covenants not to sue set forth above do not pertain to any matters other than those expressly specified in Section VI. The United States reserves, and this Decree is without prejudice to, all rights against Denver with respect to all other matters, including but not limited to, the following:

a. Claims based on a failure by Denver to meet a requirement of this Decree;

b. Liability for future disposal of additional hazardous substances, pollutants, or contaminants as defined in CERCLA, at the Site by Denver, except as set forth in Paragraph 5(a) above;

c. Liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damages assessments; and

d. criminal liability.

## VII. COVENANTS NOT TO SUE AND RESERVATIONS OF RIGHTS BY DENVER

7. <u>Denver's covenant not to sue.</u>

a. In consideration of the execution and performance of this Decree by the United States and the United States' dismissal of its claims in the Lawsuit with prejudice, and conditioned upon the United States' complete and satisfactory performance of its obligations under this Decree, including but not limited to the obligations of paragraph 9 of this Decree, Denver hereby covenants not to sue, or to take administrative action, against the United States (i) pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, with respect to the Site, including but not limited to, all such claims related to the Site made or which could have been made by Denver against the United States in the Lawsuit and (ii) all other claims made against the United States by Denver in the Lawsuit. Denver's release and covenant not to sue with regard to its claims against the United States for Denver's Past Costs and Future Response Costs shall be effective upon receipt from the United States of the payment described in paragraph 4 of this Decree.

b. In addition, without limiting the above, Denver releases the United States, the United States' agents, the United States' contractors, and potentially responsible parties with regard to the Site performing any removal or remedial action on or relating to any operable unit of the Denver Radium Site at the direction of the United States from obligations pursuant to Ordinance Nos. 549 and 145 to pay any "disposal fee" or other monetary obligation derived from Ordinance Nos. 549 and 145 with regard

to such work. This provision does not preclude the ability of Denver to enforce Ordinance Nos. 549 and 145 with respect to any other persons for disposal of Waste Material at or within the Site, or with respect to any other property not within the Denver Radium Site, and this provision does not constitute a release from the reporting requirements of RMC Section 48-114.

8. Denver's reservation of rights. Denver's covenants not to sue or to take administrative action set forth above do not pertain to any matters other than those expressly specified in Section VII. Denver reserves, and this Decree is without prejudice to, all rights against the United States with respect to all other matters, including but not limited to, the following:

a. Claims based on a failure by the United States to meet a requirement of this Decree;

b. Liability for future disposal of additional hazardous substances, pollutants, or contaminants at the Site after the date of entry of the Decree; and

c. Claims against the United States, including any department, agency or instrumentality of the United States related to the Site in the event any claim is asserted by the United States against Denver under Paragraphs 5(c) and 6 (United States' reservation of rights) but only to the same extent and for the same matters, transactions, or occurrences as are raised in the claim of the United States against Denver.

**VIII. OTHER OBLIGATIONS UNDER DECREE** To protect human health and the environment and to prevent delay of the remedy for the Site, the parties began to cooperate and implement certain actions pending entry of this Consent Decree. These actions are set forth in this section 8. Many of these obligations are now partially or fully performed.

9. Bannock Street/OU VIII. Consistent with the 1992 OU VIII Record of Decision, and subject to the availability of funds in the Hazardous Substance Superfund available for the purpose, the United States agreed to and did remove Waste Materials from the portions of South Bannock Street located within OU VIII. Denver agreed to and did cooperate with the United States during the United States' investigation, excavation, monitoring, testing, transportation and disposal of Waste Materials beneath public rights-of-way in Operable Unit VIII. Denver agreed to and did remove asphalt and concrete paving located on the parts of Bannock Street within Operable Unit VIII, and arranged the relocation of utilities in the public rights-of-way within the area of remediation. Denver also agreed to and did replace Bannock Street and any associated sidewalks after remediation was completed. Denver's costs associated with the actions described in Paragraph 9 will be counted toward any state cost share that may be required for this work.

10. Management plans.

a. Before the removal of Waste Materials from the rights-of-way located in Operable Unit VIII begins, Denver agrees to and did continue to implement its Bannock

Street Management Plan, a copy of which is attached hereto as Attachment B, as it was amended from time to time with EPA approval, for management of Waste Materials within the right-of-way.

b. Subject to paragraph 10(g) of this Decree, Denver agreed to and did continue to implement the management plan for Waste Materials located in Operable Unit VII of the Denver Radium Superfund Site, a copy of which is attached hereto as Attachment C, as it was amended from time to time with EPA approval.

c. Subject to paragraph 10(g) of this Decree, Denver agreed to and has implemented and will continue to implement the management plan for managing Waste Materials located in rights-of-way within Operable Units II, III, and VI, a copy of which is attached hereto as Attachment D, as it may be amended from time to time with EPA approval. EPA shall not unreasonably withhold its approval of amendments to the management plan.

d. If EPA determines that amendments to the management plans described in Paragraphs 10(a)-(c) are necessary to protect human health and the environment, Denver will either implement the amendments proposed by EPA or invoke dispute resolution.

e. The RODs for the various OUs of the Site did not identify radium contaminated groundwater as a threat to public health or the environment that required active remediation. Except as explicitly stated in this Decree and the version of the attached management plans as of the date of entry of this Decree, the parties agree

that Denver has not undertaken to manage or remediate groundwater that may be contaminated by radioactivity from the Site.

f. The work performed pursuant to each management plan referred to in paragraph 10 shall be performed in compliance with all applicable federal, state and local laws and regulations, and shall also so state in each such management plan. The parties believe that Denver performed all work under the management plans in compliance with all applicable federal, state and local laws and regulations.

g. The parties agree that upon a showing by Denver, approved by the United States, that Waste Materials have been removed from property owned by Denver in an operable unit of the Site subject to a Management Plan established pursuant to paragraph 10 of this Decree, to the extent that, as a regulatory matter, the property is available for unrestricted use, Denver's obligation to implement such Management Plan shall be terminated with regard to that property.

h. The parties intend that Denver's minor, non-material variations from the management plans referred to in the preceding subparagraphs shall not void the covenant granted in Paragraph 5.

11. Institutional controls. RODs for several of the OUs within the Site required that institutional controls be implemented for locations where waste was left in place, but these institutional controls have never been implemented. To assist EPA in fully implementing the remedy selected in the ROD, and in consideration for the waivers and releases granted by EPA in this Agreement, Denver agrees that within 90 days of

the entry of this Decree, it will implement and enforce Ordinance No. 549, Series of 1996, as amended by Ordinance No. 145, Series of 1997, and by Ordinance No. 590, Series of 2004, and codified at Section 48-112 and Section 49-378 of the Denver Revised Municipal Code (the "Ordinance"), as the institutional control plan for private property and public rights-of-way located in the Site where radioactive or radium contaminated materials remain at levels where controls are necessary to protect human health and the environment. A copy of the Ordinance is attached hereto as Attachment E. The management plans described in paragraph 10, *supra,* shall be additional institutional controls for public rights-of-way in the OUs identified in paragraph 10. Denver agrees to notify EPA whenever amendments to these institutional controls are proposed or considered.

12. <u>Army Corps of Engineers' contract(s)</u>. The United States and any of its components that would be considered a funding entity under 10 U.S.C. § 3036(d), approve Denver's entering into contract(s) with the United States Army Corps of Engineers for transportation and/or disposal of Waste Materials from the Site. A copy of the umbrella agreement between Denver and the Army Corps of Engineers is attached hereto as Attachment F.

13. <u>Reporting</u>. Denver will provide a report, to be submitted on the first business day of the month following the first-year anniversary of the entry of this Consent Decree, and annually thereafter for ten years, to EPA's remedial project manager for the Site, setting forth Denver's activities in the previous year undertaken

pursuant to the management plans described in Paragraph 10 above, and with regard to the institutional controls to be established by Denver pursuant to Paragraph 11 above. The Parties shall mutually agree upon an appropriate format for the report. After the ten-year period referred to in this paragraph, Denver shall submit such reports every five years unless the parties agree otherwise in writing. Denver's reporting obligations pursuant to this paragraph regarding each particular management plan will terminate at such time as Denver's obligation to implement such management plan is terminated pursuant to paragraph 10(g) of this Decree.

## IX. DISPUTE RESOLUTION

14. <u>Dispute Resolution</u>. For disputes arising between the Parties with regard to the interpretation or performance of this Consent Decree, the Parties agree to the following dispute resolution process:

a. The Parties shall first enter into an informal dispute resolution process in which they attempt to resolve the dispute through informal negotiations. The period for informal negotiations shall be thirty days from the date the dispute arises, unless this period is shortened or extended by written consent of the Parties. The dispute shall be considered to have arisen when one Party sends the other Party a written notice of dispute. The informal negotiation period will commence as of the time the Party not initiating the dispute has actual receipt of the written notice of dispute.

b. In the event the Parties are unable to resolve the dispute through informal negotiations, within fifteen days after the conclusion of the informal negotiation

period, either Party (the "initiating Party") may institute the formal dispute resolution procedures of this Paragraph by serving on the other Party (the "responding Party") a written statement of position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting its position and any supporting documentation relied upon by the initiating Party. The responding Party shall serve a responsive statement of position on the matter in dispute upon the initiating Party within twenty days of actual receipt of the initiating Party's statement of position. The initiating Party may serve a reply statement of position on the responding Party within five days of actual receipt of the responding Party's statement of position.

c. If the Parties have been unable to resolve the dispute within fifteen days of the date the last statement of position contemplated in the previous subparagraph is actually received by the Party to whom it is directed, the EPA Region VIII Assistant Regional Administrator in charge of the EPA waste management program and the Manager of the Denver Department of Environmental Health shall meet to attempt to resolve the matter. If the Assistant Regional Administrator and the Manager are unable to resolve the matter to the mutual satisfaction of the Parties, then within twenty days of the date of their meeting, the United States or Denver may file with the Court and serve on the other Party a motion for judicial review of the decision, setting forth the matter in dispute, the efforts made by the Parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree. The United States or Denver

may file a response to the motion for judicial review. Judicial review of any dispute arising under this Consent Decree which is subject to this Paragraph shall be governed by applicable principles of law, including those principles relating to standards of review.

d. The Parties agree that this Paragraph contains the exclusive process for dispute resolution under the Consent Decree, and that neither Party shall seek contempt sanctions against the other regarding any dispute subject to resolution under this Paragraph. In any dispute resolution process under this section, including judicial review, each Party shall bear its own costs and attorneys' fees.

## X. ANTI-DEFICIENCY ACT

15. Anti-Deficiency Act and Appropriations.

a. All obligations by the United States under this Decree are subject to the availability of appropriated funds applicable for that purpose, and the United States' obligations pursuant to paragraph 9 of this Decree are subject to the availability of funds in the Hazardous Substance Superfund available for that purpose.

b. No provision of this Decree shall be interpreted as or constitute a commitment or requirement that the United States obligate or pay funds in contravention of the Anti-Deficiency Act, 31 U.S.C. § 1341, or any other applicable provision of law.

c. The financial obligations imposed on Denver under this Consent Decree shall extend only to monies appropriated for the purpose of this Consent Decree by Denver's Board of Councilmen, paid into the City Treasury, and encumbered

for the purposes of this Consent Decree. The United States acknowledges that (i) Denver does not by this Consent Decree irrevocably pledge present cash reserves for payments in future fiscal years, and (ii) this Consent Decree is not intended to create a multiple-fiscal year direct or indirect debt or financial obligation of Denver.

d. The parties agree to make good faith efforts to seek funding from authorized sources to fund their obligations under this Decree.

## XI. EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION

16. Effect of settlement. Nothing in this Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Decree. The preceding sentence shall not be construed to waive or nullify any rights that a person not a signatory to this Decree may have under applicable law. Each of the Parties expressly reserves any and all rights (including, but not limited to, any right of contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto.

17. Contribution protection.

The Parties agree, and by entering this Consent Decree this Court finds, that Denver and the United States are each entitled to protection from contribution actions or claims as provided by CERCLA section 113(f)(2), 42 U.S.C. § 9613(f)(2), regarding the "matters addressed" in this Consent Decree. The "matters addressed" in this Consent Decree are those matters for which Denver and the United States have

each granted the other a covenant not to sue or take administrative action as set forth in Paragraphs 5 and 7 of this Consent Decree.

## XII. NO ADMISSION OF FACT OR LAW

18. <u>No admission of fact or law</u>. The Parties agree that neither the execution of this Decree, nor the actions undertaken by each Party in accordance with this Consent Decree, constitute an admission of liability by any Party. The Parties also agree that nothing in this Decree shall be considered an admission of any issue of fact or law by either Party.

## XIII. NOTICES AND SUBMISSIONS

19. <u>Notices and submissions</u>. Any notice, including correspondence, required or made with respect to this Decree, shall be in writing, effective upon receipt, and sent to the following persons:

<u>For the United States</u>:

Chief, Environmental Defense Section
United States Department of Justice
601 D Street, NW
Washington, DC 20004

Site Attorney
Denver Radium Superfund Site
Mail Code: 8ENF-L
U.S. Environmental Protection Agency
Region 8
1595 Wynkoop Street
Denver, Colorado 80202

Remedial Project Manager
Denver Radium Superfund Site
Mail Code: 8EPR-SA

U.S. Environmental Protection Agency
Region 8
1595 Wynkoop Street
Denver, Colorado 80202

For Denver:

City Attorney
Denver City Attorney's Office
1437 Bannock Street, Room 353
Denver, Colorado 80202

Manager of Environmental Health
Denver Department of Environmental Health
201 West Colfax Avenue, Dept.1009
Denver, Colorado 80202

The Parties may change the designated person to receive notices by written notice to the other Party.

## XIV.  CONTINUING JURISDICTION

20. <u>Continuing jurisdiction of the Court</u>. This Court retains jurisdiction over both the subject matter of this Consent Decree and the Parties for the duration of the performance of the terms and provisions of this Consent Decree for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section IX (Dispute Resolution) hereof.

## XV.  MODIFICATION

21. <u>Modification</u>. This Consent Decree may be modified by written agreement of the Parties and approval of the Court; however, amendment of the Management Plans,

as set forth in Paragraph 10(a)-(d), or the Corps contract (Attachment F), or the Ordinance shall not require Court approval. Nothing in this Consent Decree, or in the Parties' agreement to its terms, shall be construed to limit the equitable powers of the Court to modify the terms of the Consent Decree pursuant to Rule 60, Federal Rules of Civil Procedure.

## XVI. REPRESENTATIONS

22. Representations. The Parties represent and agree to the following:

a. Each Party has received independent legal advice from its attorneys with respect to the advisability of entering into the settlement memorialized in this Consent Decree and with respect to the advisability of executing this Consent Decree.

b. Neither of the Parties has relied upon any statement, representation, omission, inducement, or promise of the other Party (or any officer, agent, employee, representative, or attorney for the other Party) in entering into this settlement and executing this Consent Decree.

c. Each Party to this Consent Decree has investigated the facts pertaining to this settlement and this Consent Decree, and all matters pertaining thereto, to the full extent that the Party deems necessary.

d. Each Party has carefully read and reviewed with its attorneys, and knows and understands, the full contents of this Consent Decree and is voluntarily entering into this Consent Decree.

e. Each signatory to this Consent Decree has been authorized to execute this Consent Decree by the Party each such signatory represents.

f. The Parties agree that they jointly drafted this Consent Decree, and agree that any and all rules of construction to the effect that ambiguity is construed against the drafting party shall be inapplicable in any dispute concerning the terms, meaning, or interpretation of this Consent Decree.

## XVIII. EFFECTIVE DATE

24. <u>Effective date</u>. This Consent Decree shall become effective upon the date of entry by the Court. If, for any reason, the Court does not enter this Consent Decree, the obligations set forth in this Consent Decree are null and void, except to the extent that such obligations would be otherwise required by law.

## XIX. COUNTERPARTS

25. <u>Counterparts</u>. This Consent Decree may be executed in any number of counterpart originals, each of which shall be deemed to constitute an original agreement, and all of which shall constitute one agreement. The execution of one counterpart by any Party shall have the same force and effect as if that Party has signed all other counterparts.

## XX. FAIRNESS, REASONABLENESS AND PUBLIC INTEREST

26. <u>Fairness, reasonableness, and public interest of Consent Decree</u>. The Court finds that this Consent Decree is fair, reasonable, and in the public interest.

DONE THIS 30th DAY OF _March_ , ~~2009,~~ 2010.

- 27 -

BY THE COURT:

_____
Wiley Y. Daniel
United States District Judge


FOR PLAINTIFF UNITED STATES:

JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources
Division

Dated: _Aug. 20, 2009_

By: _____
DANIEL W. PINKSTON
Environmental Defense Section
Environment and Natural Resources
Section
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, Colorado 80294
(303) 844-1804
Daniel.pinkston@usdoj.gov

DAVID GAOUETTE
United States Attorney
District of Colorado
STEPHEN D. TAYLOR
Assistant United States Attorney
1225 17th Street, Suite 700
Denver, Colorado 80202
(303) 454-0103

FOR DEFENDANT CITY AND COUNTY
OF DENVER:

DAVID R. FINE
City Attorney

Dated: June 26, 2009

T. SHAUN SULLIVAN
KATHERINE L. WILMOTH
1437 Bannock Street, Room 353
Denver, Colorado 80202
(720) 913-3250

Manager of Environmental Health
City and County of Denver

Dated: 6/26/09

201 West Colfax, Dept. 1009
Denver, Colorado 80202

- 29 -